IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| D.P. TECHNOLOGY CORP.<br><br>　　　Plaintiff,<br><br>　　　V.<br><br>UNIFIED TOOL, DIE & MFG. CO., INC., STEVEN SCIURBA and DOES 1 THROUGH 10.<br><br>　　　Defendants. | CIVIL ACTION NO. 1:20-CV-7161 |

## INTRODUCTION

Plaintiff, D.P. Technology Corp. ("Plaintiff"), brings this action against Defendants, Unified Tool, Die & Mfg. Co., Inc. ("Unified Tool"), Steven Sciurba ("Mr. Sciurba"), an individual, and DOES 1 through 10 (collectively the "Defendants"), for copyright infringement in violation of 17 U.S.C. § 101 et seq. By this Complaint, Plaintiff seeks, inter alia, injunctive relief, monetary damages, and attorney's fees under 17 U.S.C. §§ 106, 501, 502, 504 and 505, and alleges as follows:

## THE PARTIES

1.　　Plaintiff is a corporation with a principal place of business located at 1150 Avenida Acaso, Camarillo, California 93012.

2.　　Unified Tool is a corporation with a principal place of business located at 9331 W. Seymour Avenue, Schiller Park, Illinois 60176.

3. Mr. Sciurba, an individual, is the President and Owner of Unified Tool, has control over the day to day operations at Unified Tool, and directly benefits from copyright infringement and the tortious conduct alleged herein and is the moving, active, conscious force behind Unified Tool's copyright infringement.

4. Mr. Sciurba has a business address of 9331 W. Seymour Avenue, Schiller Park, Illinois 60176 and a principal place of residence located at 3502 Majestic Oaks Drive, St. Charles, Illinois 60174.

5. Plaintiff is unaware of the true names and capacities of DOES 1 through 10, inclusive, and therefore sues said Defendants by such fictitious names. Plaintiff will ask leave of Court to amend this Complaint to state the true names and capacities of the Defendants sued as DOES when the same are ascertained. Plaintiff is informed and believes and based thereon, alleges that each of the fictitiously named Defendants are responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages, as herein alleged, were proximately caused by their conduct.

6. Plaintiff is informed and believes, and on that basis alleges, that at all times relevant to this action, each of the Defendants were the agent, affiliate, officer, director, manager, principal, alter-ego, and/or employee of the remaining Defendants and were at all times acting within the scope of such agency, affiliation, alter-ego, relationship and/or employment, and actively participated in or subsequently ratified and adopted, or both, each and all of the acts or conduct alleged herein with full knowledge of each and every violation of Plaintiff's rights and the damages to Plaintiff proximately caused thereby.

**JURISDICTION AND VENUE**

7. This is a civil action seeking damages and injunctive relief for copyright

infringement under the Copyright Act of the United States, 17 U.S.C. § 101 et seq.

8. This Court has original and exclusive jurisdiction over the subject matter of this Complaint pursuant to 28 U.S.C. §§ 1331 and 1338(a).

9. Supplemental subject matter jurisdiction may be properly exercised by this Court pursuant to 28 U.S.C. § 1367 as this Court has original jurisdiction of claims asserted under 28 U.S.C. §§ 1331 and 1338(a) and 17 U.S.C. § 101 et seq.

10. Plaintiff is informed and believes that this Court may properly exercise at least specific personal jurisdiction over Defendant, Unified Tool, because Unified Tool is an Illinois corporation located in Cook County and regularly does business in the State of Illinois and over Defendant, Mr. Sciurba, as he is President and Owner of Unified Tool, a resident of the State of Illinois and this District.

11. Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c), and/or § 1400(a).

## THE ASSERTED COPYRIGHTS

12. U.S. Copyright Registration No. TX 8-870-208, registered on July 11, 2018, and tilted ESPRIT is owned by the Plaintiff.

## BACKGROUND FACTS

13. Plaintiff is a corporation that has been registered to do business in California since 1982. The company is an industry leader in Computer Aided Manufacturing ("CAM") software used for a full range of machine tool applications.

14. Plaintiff's flagship product, ESPRIT, has grown to become one of the most recognizable brands in the CAM software market today. ESPRIT is used across a wide variety of industries, including aerospace and aviation, transportation, electronics, construction and other

industries. ESPRIT is protected by the asserted copyright referenced in paragraph 12 of this Complaint.

15. Plaintiff licenses ESPRIT to its customers. Customers may purchase single user licenses or multi-user licenses. In either case, the number of simultaneous users or end-users may not exceed the number of licenses purchased. Plaintiff prevents the unauthorized access of ESPRIT through the use of a Security Mechanism. Plaintiff's license agreement states that customers are not allowed to use ESPRIT without the Security Mechanism, and that the software can detect the installation or use of illegal copies of ESPRIT and collect and transmit data about those illegal copies.

16. Piracy of software occurs when users access software for which they have not purchased a valid license. The ease of digital replication of software lends itself to illegal copying of software, where users may make multiple copies of a software program, and then distribute the copies to users who have not made a legal purchase of the software (i.e., either distributing the software for free, or selling the copies of the software at deeply discounted prices). The licensing associated with the ESPRIT software limits how many licensed versions of the ESPRIT software can be used at once, but Plaintiff allows those licensed organizations to install the ESPRIT software on an unlimited number of computers.

17. In an effort to reduce the use of illegally copied software, software providers implement license verification technology where the software will not function unless a license has been legally purchased. The license verification technology may be a software mechanism or a physical mechanism to be attached to a single computer. The license verification technology may be in the form of a key (i.e., a series of numbers and letters) that a user types in during the software installation process, or a hardware device, where the software will only operate

correctly when the hardware device is attached to the computer executing the software. The license verification technology is provided by the software provider to the buyer when the software is purchased legally. Users who have not made a legitimate purchase of the software will not have access to the key or hardware device provided by the software provider, and therefore the software will not function properly. Plaintiff provides license verification technology as a component of the above-mentioned Security Mechanism.

18. Software hackers reverse engineer the security mechanism and then provide processes and utilities to bypass the license enforcement in order to allow unauthorized use of the software. These processes and utilities mimic the license verification technology (i.e., keys, hardware devices, etc.) as a means to allow pirated software to function fully as legally purchased software. Software utilities that mimic the license verification technology are often referred to as "cracked" licenses. Software hackers may also create hacked versions of the software such that a license is not needed during installation.

19. Sophisticated websites exist where illegally obtained software, the software utilities that mimic the license verification technology, and hacked versions of the software may be downloaded and installed by those who do not want to pay for properly licensed software. Each hacked version of the software represents a lost sale and/or license for the company that owns the software and for resellers of the software (who may provide hardware installation and support, and software configuration, customization, and maintenance). A study by the Business Software Alliance reported that properly licensed software has a positive impact on national economic activity that is more than three times the impact of pirated software.[1]

20. Software that has been hacked or modified to use a cracked license may also

---

[1] https://gss.bsa.org/wp-content/uploads/2018/05/2018_BSA_GSS_Report_en.pdf

contain malware that can damage computer systems, and/or infiltrate the computer network and the data on that network. In a report commissioned by the Business Software Alliance, the higher the pirated software rate in a country, the more malware generally encountered on computers in that country.[2] Software that has been hacked may also not operate properly, negatively impacting the reputation of the software company that now has no oversight or control over the quality of the hacked versions of its software in use, and/or the products produced by that software.

21. Piracy Detection and Reporting Security Software ("PDRSS") exists to identify instances of pirated software in use and provides the identity and location of organizations utilizing the pirated software to the software providers. Identification of pirated software allows the software providers to take legal action against intentional software piracy, notify unwitting organizations of the illegal use of the software (and the potential malware problems that can accompany pirated software), and sell valid software licenses in the place of the previously illegally obtained software programs to recoup lost sales. Plaintiff identifies instances of pirated software in use through PDRSS which, along with the license verification technology, is a component of the Security Mechanism.

22. PDRSS providers also identify the means by which software hackers have thwarted the license verification technology (i.e., the aforementioned cracked license) for a particular software program. For example, PDRSS providers may accomplish this by downloading pirated software from the above-mentioned websites and determining how the software hackers were able to bypass the license verification technology. Once the software

---

[2] https://www.bsa.org/news-events/news/report-finds-unlicensed-software-and-malware-are-tightly linked-1

hackers' methods are identified, the PDRSS providers then work with software providers, such as Plaintiff to map out a plan for determining when pirated software is in use. This includes identifying when the pirated software is using a cracked license.

23. The plan may include a variety of forms for identifying software piracy. The plan may also include defining software use patterns that are indicative of software piracy. PDRSS providers work with software providers to determine various patterns that are indicative of pirated software use and thresholds at which the PDRSS software should begin to gather and report data on the computer using the pirated software. For example, it is common for a potential customer to test out a software program for a short period of time before deciding to purchase the software package legally. However, an organization that continues to use illegally downloaded software for an extended period (i.e., beyond a reasonable test period as defined by the software provider) has breached the threshold of a trial period. Another threshold might be the detection of a cracked license, which is an indication of an anomaly within the software, or other suspicious patterns of use of the software.

24. Software providers such as Plaintiff, embed the PDRSS (according to the plan tailored specifically for that software provider) within their software, validate that the patterns and thresholds will trigger on pirated software (and will not trigger on validly purchased software), and then release the software. The software that contains the embedded PDRSS also provides a clear notice within the Software License Agreement ("SLA") of the existence of the PDRSS within the software. Once new versions of software are released, both legally purchased software and the eventually pirated software will contain the embedded PDRSS that triggers data reporting when suspicious patterns and thresholds are detected.

25. Cracked versions of ESPRIT downloaded from a pirate website still contain a

Clickwrap version of the SLA that the user of the pirated software must agree to before gaining access to the software. Attached hereto as <u>Exhibit 1</u> is a copy of the Clickwrap SLA for the pirated version of the ESPRIT software downloaded by the Defendants.

26. The serial number of the license is a unique identifier and helps in identifying unauthorized versions of the software. Multiple versions of software using the same serial number are indicative of unauthorized versions of software using a cracked license. In some cases, illegal license generators create license files having serial numbers that are inconsistent with the serial numbers generated by the software providers, which is also indicative of a cracked license.

27. The IP address is a unique address used to identify computers on the global network of the internet. An IP address is the numerical sequence by which a computer on the public internet can identify another computer on the public internet. IP addresses are in the form xxx.xxx.xxx.xxx where each xxx must be a number between 0 – 255.

28. The identifying name of a computer is typically a name an organization gives to each computer in the organization for easy identification within the organization. For example, identifying computer names Computer_Lab_1 and Computer_Lab_2 are easy to remember, and help employees within the organization easily reference particular computers, rather than, for example, referring to computers by a serial number associated with the computer hardware.

29. A Media Access Control ("MAC") address is a unique hardware identifier assigned to network interfaces. Every device that makes a physical connection to the network, whether it is an Ethernet card or port, or wireless connection has a unique and specific address. Thus, a computer with both an Ethernet connection and a wireless connection has two unique MAC addresses. A MAC address is a series of numbers and letters. When a network device is

manufactured, it is assigned a MAC address at the factory. The first six digits of a MAC address represent the device manufacturer, which can be looked up on the Internet.

30. Reporting data from the embedded PDRSS includes a variety of information to identify the software that has been pirated and the organizations utilizing the pirated software, such as the version of the software being used, the license serial number, the Internet Protocol ("IP") address of the organization where the pirated software is running, the identifying name of the computer, and a MAC address. Through the Security Mechanism, Plaintiff collects the aforementioned identifying information to determine when pirated and unlicensed versions of its ESPRIT software are being utilized.

31. Software providers may track their own reporting data or may use third party providers to track the reporting data. Once pirated copies of software are identified, software providers can notify the organizations using the software and request that they purchase valid licensed copies of the software instead of using the pirated software.

32. Through the use of PDRSS, Plaintiff has identified Defendants as using unlicensed and pirated ESPRIT software.

33. According to its website, Unified Tool provides quality tooling and precision machining to customers nationwide. The company has been in business since 1947.

34. Plaintiff has detected at least thirty-eight (38) instances of unauthorized access of ESPRIT by Defendants through the use of PDRSS. The PDRSS reported at least one (1) computer located at Unified Tool running an unauthorized version of ESPRIT between June 30, 2020 through August 24, 2020.

35. On September 23, 2020, McInnes & McLane, LLP ("M&M") sent a letter to Mr. Sciurba via email and priority mail through the United States Post Office on behalf of the

Plaintiff to inform him of the infringing use of the ESPRIT software by Unified Tool, and to seek a resolution for the matter.

36. The letter included information concerning the computers and networks used to access the unlicensed software, and also provided if a resolution could not be reached, Plaintiff would have to seek one through the Court.

37. An unknown individual at Unified Tool responded a short time later on the same day of receiving the email.

38. The individual acknowledged having the unlicensed software on a Unified Tool computer, but stated it was installed by someone thinking it was trial software, and had been removed from the Unified Tool computer.

39. The individual subsequently sent another email simply stating, "As I said I removed the software from our system and am no longer using it."

40. According to Illinois Secretary of State filings, Mr. Sciurba is the President of Unified Tool, and according to his profile on LinkedIn, Mr. Sciurba is the Owner of Unified Tool. Mr. Sciurba, as President and Owner of Unified Tool, was aware of the unauthorized use and directed the use of the unlicensed, pirated use of ESPRIT.

41. On information and belief, Defendants continue to infringe upon Plaintiff's Copyrights by using unlicensed, pirated versions of the ESPRIT software.

42. As a direct and proximate result of Defendants' acts of infringement, the Plaintiff has suffered damages and will continue to suffer damages.

43. As a direct and proximate result of Defendants' acts of infringement, the Plaintiff has suffered and continues to suffer irreparable harm for which there is no adequate remedy at law.

## COUNT ONE
### Infringement of ESPRIT Software Registration Number TX 8-870-208 ("ESPRIT") by Defendants, 17 U.S.C. §§ 106 and 501

44. The Plaintiff incorporates the previous paragraphs of this Complaint by reference and re-alleges them as originally and fully set forth herein.

45. Defendants have knowingly and intentionally infringed, and continue to infringe ESPRIT, and will continue to do so unless enjoined by this Court.

46. As a direct and proximate consequence of Defendants' infringing acts, the Plaintiff has suffered and will continue to suffer injury and damages, and unless such acts and practices are enjoined by the Court, will continue to be injured in its business and property rights, and will suffer and continue to suffer injury and damages, which are causing irreparable harm and for which Plaintiff is entitled to relief.

47. Upon information and belief, the aforementioned infringement is knowing, intentional and willful.

## COUNT TWO
### Breach of Contract

48. The Plaintiff incorporates the previous paragraphs of this Complaint by reference and re-alleges them as originally and fully set forth herein.

49. By Defendants' acceptance of the SLA upon installation of the software, Plaintiff and Defendants entered into a Software License Agreement, wherein Defendants expressly and impliedly agreed to the terms and conditions set forth in the Agreement.

50. Plaintiff has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Agreement.

51. Pursuant to the SLA, Defendants were required to obtain proper authorization and pay licensing fees to use the software and to refrain from use of pirated software. Defendants breached the Agreement by illegally downloading and using pirated versions of ESPRIT without proper authorization or payment to Plaintiff as required by the Agreement.

52. As a direct and proximate result of Defendants' breach of the SLA, Plaintiff has sustained damages in an amount to be proven at trial.

WHEREFORE, Plaintiff, D.P. Technology Corp., respectfully requests that this Court enter judgment in its favor and against Defendants, and requests relief as follows:

A. Judgment be entered in its favor and against Defendants on each count of the Complaint;

B. Declaring that Defendants have infringed the ESPRIT software;

C. Declaring that the foregoing infringement was willful and knowing;

D. Entry of a preliminary and thereafter permanent injunction prohibiting the Defendants, and their agents, servants and employees, and all persons acting in concert with, or for them from continuing to copy, download, reproduce, distribute, display, disseminate, transmit, make available for download or otherwise use the ESPRIT software in any manner whatsoever appropriating or in violation of the Plaintiff's Copyrights;

E. Award Plaintiff its actual damages and Defendants' additional profits in an amount to be determined at trial;

F. Compensatory damages for breach of contract in an amount to be determined at trial;

G. Award Plaintiff prejudgment and post-judgment interest;

H. Award Plaintiff its costs, attorney's fees and expenses arising from this suit; and,

I.  Grant Plaintiff, such other relief as this Court, deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts of its Complaint so triable.


Dated: December 3, 2020    By:  /s/Alissa A. Digman

        Alissa A. Digman
        MCINNES & MCLANE, LLP
        350 W. Ontario St., Suite 5E
        Chicago, IL 60654
        (312) 877-5805
        alissa@mcmcip.com

        John T. McInnes (pro hac vice to be filed)
        MCINNES & MCLANE, LLP
        9 Exchange Street
        Worcester, MA 01608
        (774) 420-2360
        john@mcmcip.com